UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KCH TRANSPORTATION, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE |
| v. | ) | |
| | ) | NO: 1:24-cv-01211-TWT |
| AG PRODUCTION SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

### I.    INTRODUCTION

The Court should deny AG Production Services, Inc.'s ("AG") motion to dismiss the First Amended Complaint because AG purposefully (i) solicited services performed by KCH Transportation, Inc.'s ("KCH") Georgia-based employees on 39 separate transactions, (ii) directed hundreds of communications to KCH employees in Georgia, (iii) routed eleven loads of freight to, from, or through Georgia, (iv) issued payment to KCH's Georgia-based account at a Georgia bank, and (v) took other actions directed toward this forum. These deliberate actions satisfy the "transacting any business" prong of Georgia's long-arm statute. They also suffice to establish both minimum contacts for specific jurisdiction and that haling AG to court in Georgia is fair. The Court should therefore deny this motion.

## II.    STATEMENT OF FACTS

KCH is a Georgia corporation with its headquarters in Roswell, Fulton County, Georgia. [Hinton Dec. ¶ 5, DE 6-1.] KCH is a licensed freight broker. [*Id.* ¶ 2.] KCH's clients are shippers in need of transportation services. [*Id.* ¶ 2.] KCH finds motor carriers and other transportation service providers to move clients' freight from origin to destination.  [*Id.* ¶ 2.]

AG was a KCH client. [*Id.* ¶ 2.] AG advertises itself as a production company that specializes in lighting, audio, video, staging, and design for live music events and festivals across the country. [*Id.* ¶ 3.] AG also advertises itself as building and operating venues for these events and festivals. [*Id.* ¶ 3.]

This case involves approximately 25 unpaid invoices for services provided by KCH to AG.[1] [*Id.* ¶ 4.] Each invoice represents a separate load of freight for which

---

[1] AG contends that KCH assigned four of these invoices. [Def's Mem. 6, DE 8-1.] AG cites no evidence for its allegation. [*Id.*] KCH has not sold or assigned any invoice at issue in this case. [Sec. Franklin Dec. ¶ 3.] KCH can only assume AG makes this argument by misunderstanding several documents attached to Ryan Hinton's Declaration. Hinton's declaration includes KCH's load files – including invoices, load confirmations, and other documents – for certain invoices at issue in this case. [*E.g.*, Hinton Dec. Ex. C, DE 6-4.] Several of those load files included notices of assignment from KCH's vendor that the *vendor* had assigned invoices payable by KCH to a factoring company. [*See id.* (noting "assigned for" vendor and KCH as "bill to" party that pays the vendor's factoring company).] Thus, for load 0475285, Hinton's Exhibit C includes the carrier's invoice for $3,700 to KCH and KCH's invoice for $4,400 to AG. [*Id.*] The factoring invoice is for $3,700, *i.e.*, for the carrier's lesser charges payable by KCH, not the larger amount payable to KCH.

AG Production hired KCH to arrange transportation by motor carrier. [*Id.* ¶ 4.] In total, KCH brokered AG's freight for 39 separate loads over the course of approximately four months. [*Id.* ¶ 6.]

Ryan Hinton and Dwight Philpott were KCH employees involved in providing services to AG. Mr. Hinton was the operator, meaning that he was responsible for arranging all details of the transportation of AG's freight from origin to destination, for KCH's services to AG. [*Id.* ¶ 5.] Mr. Hinton was based in Georgia. [*Id.* ¶ 5.] KCH's salesperson for AG was Dwight Philpott, who was also based in Georgia. [*Id.* ¶ 5.] AG would have separately solicited and ordered each load to Mr. Philpott or Mr. Hinton. [*Id.* ¶ 6.]

Although the process can vary from load to load and customer to customer, each load typically involves a similar process. [*Id.* ¶ 7.] A client contacts KCH, through the operator or salesperson, because it needs a load moved. [*Id.* ¶ 7.] The client communicated the pickup location, dropoff location, dates, and any other relevant information. [*Id.* ¶ 7.] KCH finds a carrier, gets a quote from the carrier, and provides its own quote to the client. [*Id.* ¶ 7.] The client then accepts KCH's quote. [*Id.* ¶ 7.] Once the load is moving, KCH and the client remain in contact about

---

[*Id.*] If KCH had factored a receivable, the factoring company would have billed $4,400, not $3,700. The same is true for the other loads AG claims were assigned. There is no basis for AG to suggest KCH has assigned any invoice.

delays, accessorial charges, pickup and dropoff notifications, and other matters. [*Id.* ¶ 7.] It is therefore typical for there to be many communications about each load. [*Id.* ¶ 7.] The loads with AG generally followed this process. [*Id.* ¶ 7.] After KCH landed the account, AG solicited KCH's business for each load. [*Id.* ¶ 7.] AG sent multiple communications about each load to KCH employees in Georgia. [*Id.* ¶ 7.]

AG sent multiple communications about each load to KCH employees in Georgia. [*Id.* ¶ 7.] As the operator for AG's loads, Mr. Hinton interacted with several AG employees, including Chad Taylor, Russ Jacobs, and the owner, Andrew Gumper. [*Id.* ¶ 8.] AG sent hundreds of communications to Mr. Hinton in Georgia by telephone, text, and email. [*Id.* ¶ 8.] AG Production telephoned and texted Mr. Hinton at a Georgia telephone number with a 404 area code. [*Id.* ¶ 8.] AG Production also communicated with Mr. Philpott in Georgia through a Georgia telephone number. [*Id.* ¶ 8.]

Many of AG's loads involved transportation from, to, or through Georgia. Of the 25 unpaid invoices at issue in this case, at least four loads originated in or moved through Georgia. [*Id.* ¶ 10.]  Load 0473569 involved a pickup of AG's freight from Atlanta, Georgia for delivery to a music festival in Miami, Florida. [*Id.* ¶ 11, Ex. A, DE 6-2.] This load also involved a second pickup of lumber, which AG bought from Mid-South Lumber Company, from Lithonia, Georgia. [*Id.* ¶ 11.] Load 0473570

involved a pickup of AG Production's freight from Atlanta, Georgia for delivery to a music festival in Miami, Florida. [*Id.* ¶ 12, Ex. B, DE 6-3.] Loads 0475285 and 0475286 involved pickups of AG freight from New Castle, Delaware for delivery to a music festival in Miami, Florida. [*Id.* ¶¶ 13, 14, Exs. C, D, DE 6-4, 6-5.] Both of these loads traveled through Georgia *en route* to their destination.

In the fourteen loads for which AG issued payment, seven involved transportation in Georgia. AG hired KCH to move four loads from Thomas Concrete in Atlanta, Georgia to Pratt-Pullman Yards in Atlanta, Georgia. [*Id.* ¶ 15, Ex. E, DE 6-6.] AG then hired KCH to move three additional loads from Pratt-Pullman Yards to Miami Gardens, Florida. [*Id.*]

KCH gave AG payment instructions for ACH transfers. [First Franklin Dec. ¶ 3, DE 6-8.] KCH's payment instructions identified its bank as Synovus, a bank based in Columbus, Georgia. [*Id.*] KCH's instructions showed that payments to KCH are made to a Georgia-based account. [*Id.*] AG issued payment to KCH's Georgia-based account at its Georgia-based bank. [*Id.* ¶ 4.] AG cites no evidence to contradict these payment details.[2] [*See* Def.'s Mem. 7, DE 8-1.]

---

[2] Instead, AG argues that it hasn't paid KCH. [*See* Def.'s Mem. 7, DE 8-1.] This is misleading. Although AG is certainly delinquent on a large amount of money, KCH acknowledges being paid by AG on 14 other invoices that were part of the same series of transactions at issue in this case. [*See* Hinton Dec. ¶ 15, DE 6-1.]

It appears that AG also entered into transactions in Georgia for the freight moved with KCH's services. As noted above, KCH has tendered the purchase order for lumber bought in Lithonia, Georgia and moved to Miami. [Hinton Dec. ¶ 16, DE 6-1.] KCH also believes that AG bought or rented from Thomas Concrete, located in Atlanta, Georgia, the freight moved to Pratt-Pullman Yards and then to Miami. [*Id.* ¶ 16.]

AG also holds itself out as having undertaken at least three large projects in Georgia. [*See id.* ¶ 17.] AG has been reported as the company hired to build a 1,200-seat basketball arena for the Overtime Elite basketball league. [*Id.* ¶ 17, Ex. F, DE 6-7.] AG has advertised on social media that it completed a project in April, 2021 for Triller Fight Club at Mercedes-Benz Stadium. [*Id.*] AG has also advertised on social media that it built an "epic structure" at Atlantic Station in February, 2019 for a Foo Fighters concert in connection with the Super Bowl. [*Id.*] AG's video of the 2019 event shows how AG built a massive temporary concert venue on a dirt lot in Atlantic Station. [*Id.* ¶ 17.] Each project effectively represents a large construction project in Georgia, from which AG has derived significant revenue.

KCH lacks complete information about the full extent of AG's projects and business in Georgia. [*Id.* ¶ 18.] KCH lacks access to non-public information about AG's involvement with the three projects identified above or any other projects in

Georgia. [*Id.* ¶ 18.] KCH will only be able to obtain such information from AG by getting it through this lawsuit.[3] [*Id.* ¶ 18.]

## III.   ARGUMENT AND CITATION TO LAW

The Court should deny AG's motion because AG is subject to personal jurisdiction in Georgia. "A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution."  *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257-58 (11th Cir. 2010).

"A plaintiff seeking to obtain jurisdiction over a nonresident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999). "The plaintiff bears the burden of proving by affidavit the basis upon which jurisdiction may be obtained only if the defendant challenging jurisdiction files affidavits in support of his position." *Id.* The Court "must construe the allegations in

---

[3] In its Memorandum, AG noted a second action, pending in Nevada, relating to its unpaid debt. As described in more detail in Jessica Franklin's Second Declaration, the Nevada action was filed in error, without KCH's authorization, by a former collection agency. [Sec. Franklin Dec. ¶¶ 4-6, Ex. A.] KCH first learned of the Nevada action on April 24, 2024 and obtained a dismissal on April 26, 2024. [*Id.*]

the complaint as true, to the extent they are uncontroverted by defendant's affidavits or deposition testimony." *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988). "[W]here the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must construe all reasonable inferences in favor of the non-movant plaintiff." *Id.*

The following two subsections will show that: (A) AG has transacted sufficient business in Georgia to satisfy the long-arm statute; and (B) AG has purposefully availed itself of the privilege of conducting business in Georgia through a laundry list of deliberate conduct directed to this forum.

**A.    AG transacted sufficient business in Georgia to satisfy the long-arm statute.**

Jurisdiction over AG satisfies Georgia's long-arm statute because AG has transacted business in Georgia. Georgia's long-arm statute provides that

> A court of this state may exercise personal jurisdiction over any nonresident . . . as to a cause of action arising from any of the acts . . . enumerated in this Code section, in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she:
> (1) Transacts any business within this state; . . . .

O.C.G.A. § 9-10-91. Courts construe subsection (1) literally. *Innovative Clinical & Consulting Servs., LLC v. First Nat. Bank of Ames*, 279 Ga. 672, 675 (2005). "'Any' means to 'to any extent' or 'in any degree.'" *Diamond Crystal*, 593 F.3d at 1264 n.18 (quoting *Webster's New Int'l Dictionary* (1993)). "Under subsection (1),

analyzing whether the nonresident defendant 'transacts any business within this state' is the sole touchstone of long-arm jurisdiction." *Id.* at 1263 n.15. Georgia's long-arm statute "on its face, includes no element of 'foreseeability.'" *Id.*

Ultimately, subsection (1) merely requires "that the non-resident defendant has purposefully done *some* act or consummated *some* transaction in Georgia." *Id.* at 1264 (internal quotation marks omitted; emphasis added); *Innovative Clinical & Consulting Servs., LLC v. First Nat. Bank of Ames*, 279 Ga. 672, 675 (2005). When looking for sufficient business, Courts must consider the nonresident's intangible contacts with the State. *Innovative Clinical*, 279 Ga. at 675. "As a result, a nonresident's mail, telephone calls, and other 'intangible' acts, though occurring while the defendant is physically outside of Georgia, must be considered." *Diamond Crystal*, 593 F.3d at 1264. *See also Aflac, Inc. v. SDT Air, LLC*, 978 F.Supp.2d 1304, 1311-12 (M.D. Ga. 2013) (finding jurisdiction, including transaction of business in Georgia, in part, from negotiations and communications directed to Georgia); *Paxton v. Citizens Bank and Trust of W. Ga.*, 307 Ga. App. 112, 116 (2010) ("In light of *Innovative Clinical, etc. Svcs.*, it seems clear that Georgia allows the assertion of long-arm jurisdiction over nonresident defendants based on business conducted through postal, telephonic, and Internet contacts.").

In *Diamond Crystal*, the Court found that a California food distributor, Food Movers, transacted business in Georgia. *Diamond Crystal*, 593 F.3d at 1254. The manufacturer-plaintiff sued to recover nonpayment for two shipments of sweetener. *Id.* Food Movers bought sweetener from the plaintiff through a California-based broker. *Id.* at 1255. Plaintiff's sales representative was based in California and received purchase orders in California. *Id.* The parties entered into fourteen transactions to buy $1.9 million of sweetener. *Id.* After buying the product, Food Movers resold the product to its own customers. *Id.* Food Movers took title to the shipments at plaintiff's plant with "customer pickup," even if it did not take actual possession. *Id.* at 1256. Although only two transactions were unpaid, the Court considered all fourteen transactions for jurisdictional purposes. *See generally id.* Under these facts, the Court found Food Movers transacted business by sending purchase orders directed to Georgia, requesting delivery in Georgia, directing third parties to accept delivery in Georgia, taking legal title to goods in Georgia, and issuing payment in Georgia. *Id.* at 1266-67.

Here, AG's transaction of business in Georgia surpasses the activities found sufficient in *Diamond Crystal*. In *Diamond Crystal*, Food Movers made fourteen transactions for Georgia-produced goods; AG contracted for KCH's Georgia-based services 39 times. [Hinton Dec. ¶ 6., DE 6-1] While Food Movers directed purchase

orders to Georgia by submitting them to a California-based sales representative, AG negotiated and ordered services through hundreds of emails, calls, and text messages sent directly to KCH's Georgia-based employees, Dwight Philpott and Ryan Hinton, including to their Georgia telephone numbers. [*Id.* ¶ 8.] Food Movers directed transportation pickups from Georgia Facilities, just like AG, which directed eleven loads to, from, or through Georgia. [*Id.* ¶¶ 11-15, Exs. A-E, DE 6-2 through 6-6.] Three loads involved pickups from Thomas Concrete in Atlanta, Georgia with deliveries to Pratt-Pullman Yards in Atlanta, Georgia. [*Id.* ¶¶ 15, Ex. E, DE 6-6.] Six loads involved pickups from Pratt-Pullman Yards in Atlanta, Georgia with deliveries to Miami, Florida. [*Id.* ¶¶ 11, 12, 15, Exs. A, B, E, DE 6-2, 6-3, 6-6.] Load 0473569 included a stop in Lithonia, Georgia for a second pickup of lumber AG bought from a Georgia company to ship to Miami.[4] [*Id.* ¶ 11, Ex. A (at pages 1, 2, and 5), DE 6-2.] Two other loads from Delaware to Miami travelled through Georgia. [*Id.* ¶¶ 13, 14, Exs. C, D, DE 6-4, 6-5.] Although KCH's invoices list a Tennessee address, KCH received payment via ACH through a Georgia-based account at a Georgia bank, as in *Diamond Crystal*, which received payment, in part, by wire in Georgia.

---

[4] KCH also believes that AG also purchased concrete barriers or similar items shipped from Thomas Concrete, in connection with AG's project in Miami. [*See* Hinton Dec. ¶ 16, DE 6-1.] However, documents, such as purchase orders, and other information about the ownership and acquisition of the freight are exclusively in AG's possession.

[First Franklin Dec. ¶¶ 3-4, Ex. A, DE 6-8, 6-9.] This conduct suffices to constitute the transaction of *any* business.

AG fails to raise any competent evidence to the contrary. Although AG filed certain shipping invoices, it omits reference to shipments to, from, or through Georgia. [*Compare* Def.'s Mem. Ex. B, DE 8-3, *with* Hinton Dec. Exs. A, B, E, DE 6-2, 6-3, 6-6.] Otherwise, AG has filed the Declaration of Jacquelyn Kelley, which is not probative for several reasons. First, Kelley's Declaration is conclusory and merely denies certain types of contacts, none of which are necessary for jurisdiction, with the State of Georgia. *See Posner*, 178 F.3d at 1215 (conclusory affidavit was insufficient to shift burden of production to plaintiff). Second, and relatedly, Kelley's Declaration fails to address the specific contacts KCH has alleged and proven. Kelley does not contradict KCH's evidence about AG's hundreds of communications directed to KCH service providers operating in Georgia, AG's shipments to, from, or through Georgia, the goods AG bought and shipped in Georgia, AG's payments to KCH's Georgia bank account, or anything else. Ultimately, Kelley's declaration fails to shift the burden to KCH.

The cases cited by AG likewise do not require dismissal. AG primarily cites cases dismissing tort claims against uninvolved corporate affiliates, which is not analogous to this action. In *Byrd*, the court dismissed a product liability claim against

a corporate affiliate not involved in the sale of an alleged-defective vehicle. *Byrd v. Drive Electric, LLC*, Case No. 415-120, 2016 WL 3964239, at *3 (N.D. Ga. Jul. 20, 2016). In *McCarthy*, the court dismissed a product liability claim against a Japanese parent company that purchased one watercraft from Georgia. *McCarthy v. Yamaha Motor Mfg. Corp.*, 994 F.Supp.2d 1318, 1325 (N.D. Ga. 2014). In *Brazil*, the court dismissed mostly product liability claims relating to a diabetes drug, when there was no evidence a corporate holding company derived revenue from Georgia. *Brazil v. Janssen Research & Dev. LLC*, 249 F.Supp.3d 1321, 1332 (N.D. Ga. 2016). None of these cases involve the level of purposeful and repeated business that AG transacted in Georgia.

To meet subsection (1) of Georgia's long-arm statute, KCH is only required to show that AG transacted *some* business. Indeed, AG repeatedly transacted business in Georgia through 39 different transactions, hundreds of communications, eleven shipments, and several payments. This purposeful conduct more than satisfies Georgia's long-arm statute.

**B.    AG has sufficient contacts with Georgia to allow personal jurisdiction.**

AG's contacts with Georgia suffice to satisfy the Due Process Clause. "The heart of [the Due Process Clause] protection is fair warning – [it] requires that the defendant's conduct and connection with the forum State be such that he should

reasonably anticipate being haled into court there." *Diamond Crystal*, 593 F.3d at 1267 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) (internal quotation marks omitted)). "[S]tates may exercise jurisdiction over only those who have established certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408 (1984) (internal quotation marks omitted)). Here, AG is subject to specific jurisdiction.

**1.    AG is subject to specific jurisdiction because it purposefully directed its activities at Georgia residents.**

"In specific jurisdiction cases, the fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum . . . and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* (quoting *Burger King*, 471 U.S. at 472-73 (internal quotation marks omitted)). "[T]he defendant must have 'purposefully availed' itself of the privilege of conducting activities, that is, purposefully establishing contacts – in the forum state and there must be a sufficient nexus between those contacts and the litigation." *Id.* "Once this showing is made, a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.*

The Eleventh Circuit has identified factors, present here, which indicate purposeful contact by a nonresident defendant. Thus, notwithstanding AG's argument that it is merely a consumer of KCH's services, a defendant can purposefully subject itself to jurisdiction by initiating a contractual relationship and soliciting the plaintiff's business. *See Diamond Crystal*, 593 F.3d at 1268 n.24 (defendant initiated purchase orders); *Sloss Ind. Corp. v. Eurisol*, 488 F.3d 922, 933 (11th Cir. 2007) (ten unsolicited orders over several months); *Sw. Offset, Inc. v. Hudco Pub. Co., Inc.*, 622 F.2d 149, 150-52 (5th Cir. 1980) (defendant initiated "approximately eight" orders). Likewise, placing multiple orders shows contact that is deliberate and not attenuated. *See Diamond Crystal*, 593 F.3d at 1268-69 n.28 (fourteen transactions); *Sloss*, 488 F.3d at 933 (ten); *Sw. Offset*, 622 F.2d at 150 (nine). Contrary to AG's position on intangible contacts, a defendant can deliberately avail itself of a forum by sending repeated intangible communications to a forum to negotiate or enter into a contract. *See Diamond Crystal* 593 F.3d at 1269 n.30; *Sloss*, 488 F.2d at 933 (36 communications into forum); *Air Products & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551-52 (6th Cir. 2007) (several hundred communications to discuss contracts and order goods). A defendant can also purposefully establish contact by shipping or moving goods through a forum. *See Diamond Crystal*, 593 F.3d at 1268 n.26, 1270 (fourteen shipments with

customer pickup in Georgia). Payment in a jurisdiction similarly reflects purposeful contact with a forum. *Id.* at 1269-70 (payment directed to Georgia).

Here, AG deliberately entered into a longstanding business relationship in Georgia. Once KCH landed AG's account, AG solicited KCH's services on 39 separate transactions. [Hinton Dec. ¶ 6, DE 6-1.] For each transaction, AG purposefully initiated contact with KCH when AG had a load that needed transportation. [*Id.* ¶¶ 6-7.] In negotiating, accepting, and providing information relating to these loads, AG directed hundreds of communications to KCH employees in Georgia. [*Id.* ¶¶ 7-8.] Eleven of those loads moved freight from, to, or through Georgia. [*Id.* ¶¶ 11-15, Exs. A-E.] At least one load involved a pickup of lumber AG purchased in Lithonia, Georgia. [*Id.* ¶ 11, Ex. A, DE 6-2.] KCH believes that AG purchased or rented concrete pieces from Thomas Concrete in Atlanta, Georgia, then directed KCH to transport those pieces to another location in Atlanta, then Miami. [*Id.* ¶ 16.] When AG paid its invoices, it did so via ACH to a Georgia bank account. [First Franklin Dec. ¶¶ 3-4, Ex. A, DE 6-8, 6-9.] Taken together, these purposeful contacts put AG on notice it could be sued in Georgia and are more than sufficient to show AG has purposefully established contacts in Georgia. *See Diamond Crystal*, 593 F.3d at 1270.

Contrary to AG's mischaracterizations, AG's contacts substantially relate to this litigation. Each contact outlined above arises out of a several month period during which the parties regularly conducted business. 25 of the 39 transactions involve the unpaid invoices KCH seeks to collect in this action. A commensurate proportion of AG's intangible contacts are related to this action. Four of the eleven shipments that traveled to, from, or through Georgia are subject to collection in this action. KCH's payment instructions required AG to perform by issuing payment in Georgia. This suffices to show a substantial nexus between AG's contacts and this litigation. *See Diamond Crystal*, 593 F.3d at 1267.

> **2.    AG has failed to make a compelling case that exercising personal jurisdiction over AG offends traditional notions of fair play and substantial justice.**

Once a plaintiff has established that a defendant has purposefully established contacts with the forum, "a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Diamond Crystal*, 593 F.3d at 1267 (quoting Burger King, 471 U.S. at 477). "In this analysis, [courts] look to the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in

furthering fundamental substantive social policies." *Diamond Crystal*, 593 F.3d at 1274.

There is no substantial burden on AG to litigate in Georgia. Although travelling to Georgia may impose some cost, this cost is not constitutionally-significant to AG. AG has generated revenue in Georgia through large construction projects, which basically involve building arenas. Georgia is clearly not inconvenient or overly burdensome when AG wants to earn money. AG apparently only objects about coming to Georgia to pay its bills. But, having accepted the privilege of doing business here, AG has the responsibility to pay its debts here. There is no unfair burden to AG litigating in Georgia. This is particularly true when AG is already litigating another case in this District. *See Overtime Elite LLC v. Gumper, et al.*, Case No. 1:2022-cv-04143.

On the other hand, jurisdiction in Georgia protects KCH's interest in convenient and effective relief. Georgia represents a convenient forum for KCH to make Georgia-based witnesses available to testify. Georgia law recognizes standard claims and defenses for litigants. Georgia-based courts are competent and qualified to handle this dispute, which is not overly complex.

Just as KCH has an interest in convenient and effective relief, Georgia has an interest in providing a forum to adjudicate cases conveniently and effectively for

domestic litigants. Convenient access to justice is a fundamental state function. When a foreign company stiffs a Georgia resident on a $140,000 bill for services rendered in Georgia, Georgia has an interest in adjudicating the dispute.

Jurisdiction in Georgia was also foreseeable. KCH is a Georgia corporation. When AG solicited KCH's services and placed orders, it did so to Georgia-based employees. Those employees performed every service at issue in this case in Georgia. AG reached those employees through telephones with Georgia area codes. AG placed orders for eleven transactions to move to, from, or through Georgia. On the instances when AG paid its bill, it followed ACH instructions to a Georgia bank and a Georgia bank account. Given those facts, it is unclear why AG would expect to be sued anywhere other than Georgia.

AG has failed to meet its burden to establish a compelling case that jurisdiction in Georgia is unfair. To the contrary, it is entirely fair for AG to litigate here for all the reasons outlined above. The Court should therefore deny AG's motion.

## IV.   CONCLUSION

The Court should deny AG's motion and remand to the State Court of Fulton County, Georgia.

Submitted this 9th day of May, 2024.


/s/ T. Brandon Welch
T. Brandon Welch
Georgia Bar No. 152409
*brandon@stillmanwelch.com*
Attorney for Plaintiff

Stillman Welch
315 W. Ponce de Leon Ave. Ste 1070
Decatur, Georgia 30030
Telephone: (404) 895-9040
Facsimile: (404) 907-1819

## **CERTIFICATE OF SERVICE**

This is to certify that I have this day served counsel for the other parties in the foregoing matter with a copy of this Memorandum via the Court's CM/ECF notification system to all counsel of record.

Submitted this 9th day of May, 2024.

/s/ T. Brandon Welch
T. Brandon Welch
Georgia Bar No. 152409
*brandon@stillmanwelch.com*
Attorney for Plaintiff

Stillman Welch
315 W. Ponce de Leon Ave. Ste 1070
Decatur, Georgia 30030
Telephone: (404) 895-9040
Facsimile: (404) 907-1819